HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

DAVID RICE and ELIZABETH RICE,
individually and as a marital community; and
SETH DONAHUE, individually,

                 Plaintiffs,

v.

CITY OF ROY, a Washington municipality;
CHRIS JOHNSON, individually; and
DARWIN ARMITAGE, individually

                 Defendants.

NO. 3:20-cv-05223-RJB

DEFENDANTS' TRIAL BRIEF

COME now the defendants, City of Roy, Chris Johnson, and Darwin Armitage ("Defendants"), by and through their undersigned attorneys of record, and pursuant to the Minute Order Setting Trial and Pretrial Dates (dkt. # 16), provide their trial brief.

## I.      <u>INTRODUCTION AND PROCEDURAL POSTURE</u>

Plaintiffs David Rice, his wife Elizabeth Rice, and his nephew Seth Donahue filed this lawsuit on March 11, 2020.  The case arises from an incident that occurred just outside of Roy, Washington on February 9, 2019.  While intoxicated, Mr. Rice and Mr. Donahue drove a 2013 Polaris RZR (an ATV) recklessly around the area.  Officer Johnson witnessed their reckless driving and engaged them

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 1

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

in a pursuit.  Mr. Rice fled from Officer Johnson and drove his ATV down a set of railroad tracks.

Officer Johnson terminated the pursuit and drove down the highway, parallel to the railroad tracks,

parked his car, got out, and, while standing on the tracks, yelled for Mr. Rice to stop.  Mr. Rice did

not stop.  Officer Johnson tried to get out of the way, but he was not able to do so in time.  Mr. Rice

hit Officer Johnson with the front right brush guard of his ATV, picking up Officer Johnson and

moving him backwards.  Officer Johnson feared for his life.  He fired his gun four times, hitting Mr.

Rice in the shoulder and groin and Mr. Donahue in the hand.  Mr. Rice continued driving, and Officer

Johnson stopped them farther down the road.

Pierce County investigated the shooting.  The City of Roy's Police Chief, Darwin Armitage

(who has since retired), did not conduct his own investigation into the shooting event, because he did

not want to interfere with Pierce County's independent investigation.  He also has not conducted an

internal investigation to determine whether Officer Johnson's actions violated any of the City's

policies or procedures.  He did, however, allow Officer Johnson to return to work.

The plaintiffs made a number of claims, some of which the Court dismissed at summary

judgment and some by way of a stipulated order.  (Dkt. #104 and #114.)  The claims remaining for

trial are: (1) a Fourth Amendment excessive force claim under 42 U.S.C. § 1983 against Officer

Johnson; (2) § 1983 *Monell* claim asserted against the City of Roy based upon a theory that Chief

Darwin Armitage ratified Officer Johnson's alleged excessive force; and (3) state law negligence.

(Order, ECF #104).  There are no remaining claims asserted against Chief Darwin Armitage in his

personal capacity.  Defendants deny all plaintiffs' claims and assert the following affirmative

defenses: (1) qualified immunity; (2) the felony bar defense under RCW 4.24.420; (3) the intoxication

defense under RCW 5.40.060; (4) contributory fault; and (5) failure to mitigate.

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 2

## II.   <u>EVIDENCE AT TRIAL</u>

**A.   The Evening of February 9, 2019 and Officer Johnson's Pursuit**

On February 9, 2019, Mr. Rice and Mr. Donahue spent the day doing chores at Mr. Rice's parents' house where he lived.  There had been over a foot of snow in the area.  Mr. Rice drank that afternoon, having "maybe more than five" cans of Coors Light while at home. Mr. Donahue drank between six and ten beers that afternoon.

At some point that evening, Mr. Rice went for a ride in his 2013 Polaris RZR (referred to herein as an ATV) with Mr. Donahue as passenger.  It had stopped snowing, but there was still between 12 and 16 inches of snow on the ground, with compact snow on the roads.  After riding around for a while, they stopped at the Roy Tavern, then went to a corner store in nearby McKenna, bought more beer, then went to Walt's Tavern.  After having one or two beers at Walt's, they stopped on the railroad tracks near the Rices' home to drink more beer from the back of the ATV.

Because they forgot to buy chewing tobacco earlier that night, Mr. Rice and Mr. Donahue decided to drive the ATV to a Chevron gas station located at the intersection of McNaught (SR 507) and Higgins Greig Road in the City of Roy.  It was not legal to drive an ATV in the City, and even if it was, this particular ATV did not have a license plate or any mirrors.  They drove north on the railroad tracks, then traveled north up McNaught to the Chevron.  The gas station was closed, so they drove by, "whipped around a bunch" in the snow, then headed back home by driving south to 288th and getting back on the train tracks.  They testified that, after leaving the gas station eastbound, they completed two loops around the City before traveling back down McNaught to 288th, and then back onto the railroad tracks heading south.  The image below (Exhibit A1) shows the portion of the City of Roy where many of these events occurred.

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    Meanwhile, Officer Johnson was on duty, wearing his department-issued jumpsuit and

20  driving his fully marked police SUV.  At about 9:30 p.m., he was on patrol on Huggins Greig Road,

21  heading east toward McNaught.  He observed an off-road vehicle also traveling eastbound on Higgins

22

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 4

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Greig Road toward Peterson.  It turned north onto Peterson, running the stop sign, sliding sideways, and flooring the gas.  This was a residential area, and Officer Johnson had seen people sledding down the hill on Peterson numerous times that evening.  He pulled his patrol car behind the ATV and activated his emergency lights and siren.  The ATV did not slow down and was traveling too fast for the conditions.  The driver approached McNaught and turned left, failing to stop for the stop sign and driving through the dirt lot that ran along the side of the road before getting back onto the highway.

Officer Johnson continued to follow the ATV, and his emergency sirens can be heard in the background of many of his radio communications with dispatch.  The ATV spun around on McNaught and was facing Officer Johnson's vehicle.  They then drove north at a high rate of speed back toward the City of Roy.  They turned right at the Chevron gas station, with Officer Johnson still in pursuit.

Mr. Rice and Mr. Donahue claim they did not hear any police sirens, see any police lights, or know there was a police officer following them, but video and audio evidence show that Officer Johnson had his emergency sirens activated and, at one point near the Chevron gas station, he was only 57 feet behind them with his emergency lights flashing.  Officer Johnson continued pursuit of the ATV through the city and back down McNaught at 41 miles per hour, until Mr. Rice turned right onto 288th and then right again heading southbound on the railroad tracks, which also was not legal.  At this point, Officer Johnson cancelled the pursuit and headed back toward McNaught/SR 507.

Retired Fire Chief Bob Vellias will testify at trial.  He had been traveling north on McNaught approaching 4th Street when he noticed flashing lights from behind him.  He pulled right into the fire station driveway.  Then, when pulling out onto eastbound 3rd Street, he observed the ATV come sliding around the corner from northbound Peterson onto westbound 3rd.  He then observed Officer

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Johnson's Roy PD SUV come around the same corner with emergency lights activated. Fire Chief Vellias estimated the ATV was traveling between 10 and 15 miles per hour, noting the roads were in terrible condition with ice and snow.  He believes Officer Johnson's patrol car was close enough to the ATV that the driver would have known he was being pursued by police.  Mr. Vellias' testimony will also corroborate Officer Johnson's testimony about his pursuit path.

**B.    The February 9, 2019 Shooting**

At this point, Officer Johnson decided to locate the vehicle farther down the railroad tracks. He turned off his lights and sirens and headed back to McNaught Street, traveling south. He saw the LED headlights of the ATV as it traveled south on the railroad tracks toward 295th Street. Officer Johnson was traveling faster than the ATV and turned east onto 295th Street, parking his patrol car just west of the railroad tracks facing east.  His patrol car did not block the tracks.  He did not have any lights on at that point. Once he saw the ATV getting closer, Officer Johnson turned on his spotlight and directed it northbound on the railroad tracks. He did not turn on his emergency lights or sirens, because he forgot to do so under the rapidly evolving circumstances. He believed the spotlight would backlight him, allowing the plaintiffs to see him as they approached.  He also thought they would know he was likely the police officer pursuing them just minutes earlier.

Officer Johnson walked up the tracks about 25 feet from where his patrol car was parked, standing on the tracks with his gun drawn.  He could see the ATV approaching him. He removed his flashlight and his department issued Glock 22 .40 caliber pistol with a flashlight mounted on it, because he was planning to conduct a high-risk stop with at least one volatile, non-compliant suspect who had been continuously ignoring law enforcement commands and lights and siren. Officer Johnson kept his firearm in the low ready position or somewhat higher, pointed toward the ATV. As the ATV got

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   closer, Officer Johnson yelled as loudly as he could, "Stop Police" three times.

2       The ATV did not appear to slow down or stop, so Officer Johnson attempted to move off the

3   tracks to avoid being struck.  However, he was not able to move in time.  He believes the bright LED

4   lights made the UTV appear farther away than it was, causing him to misjudge how much time he

5   had to move.

6       The front passenger side brush guard of the ATV struck Officer Johnson.  His left arm went

7   up onto the passenger side "A pillar" of the vehicle.  Both his feet left the ground, and for a moment

8   or two, he was stuck by the front side of the ATV as it moved forward.    He could see Mr. Rice

9   leaning over onto the passenger side, with his arms fully extended out to the steering wheel. He could

10  hear someone inside the ATV giving a celebratory-like yell of "whoo hoo!" He could also see that

11  Mr. Donahue was holding a Pabst Blue Ribbon beer can.

12      Officer Johnson feared for his life, believing he was about to be run over. He brought his

13  firearm in close to his body on his right side near his ribcage and fired what he believed at the time

14  to be three rounds towards the driver side of the UTV.  We now know he fired four times, with two

15  bullets entering the vehicle through the front windshield and two entering the passenger side

16  window. This is because, as Officer Johnson was firing, his body started sliding down the

17  passenger side of the UTV. As he slid off, the right rear tire struck him before his feet hit the

18  ground. The impact knocked him to the ground directly next to the tracks.

19      At 9:39 p.m., Officer Johnson reported over his police radio, "[unintelligible, shots fired, shots

20  fired!"  When dispatched asked if he was okay, Officer Johnson replied, "I'm fine … he just about

21  took me out."  He also said, "He tried to hit me with the vehicle … he actually succeeded."

22

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Mr. Rice testified he was traveling down the tracks when he suddenly saw a bright light.  He let off the gas but did not apply his brakes.  Seconds later, he saw a car parked nearby and somebody "coming straight at them," either on the train tracks or right beside them.  He then realized he had been shot.  Mr. Donahue saw a spotlight blinding him and a reflection of an SUV; within 10 seconds, he heard gunfire and saw "yellow, flaming lights."  Upon seeing the SUV, he believes there was enough time to stop, and that if he wanted his uncle to stop, he could have gotten his attention.  Both deny that the ATV struck Officer Johnson.  Instead, they are pursuing a case theory that Officer Johnson intentionally blacked out his vehicle to ambush the plaintiffs and attempt to kill them.  Ultimately, Mr. Donahue was shot once in his left hand and Mr. Rice was shot once in his right shoulder area and once in his left groin.

**C.    Post-Shooting Events**

After he was shot, Mr. Rice continued driving his ATV and headed southbound on SR 507.  Meanwhile, Officer Johnson returned to his car, turned on his lights and siren, and followed the ATV.  At about 9:42 p.m., he stopped by the ATV and ordered the plaintiffs at gunpoint to exit the vehicle.  Mr. Donahue got out of the vehicle and onto the ground, but Mr. Rice could not.  Officer Johnson notified dispatch and requested medics.  A few minutes later, backup officers from the City of Yelm and Pierce County arrived at the scene, along with two sets of EMTs.  Some of those first responders will testify at trial about the plaintiffs' obvious intoxication and statements made against interest.

Once the other law enforcement officers were on scene, Officer Johnson did not have any further contact with Mr. Rice or Mr. Donahue.  Chief Armitage arrived at the scene, but did not have any interaction with Mr. Rice or Mr. Donahue.  No one was arrested for any crimes.  Chief Armitage

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

spoke briefly with Officer Johnson about the incident that night.  Chief Armitage then contacted

Pierce County and requested that they conduct an independent investigation into the entire incident.

Chief Armitage has not conduct his own internal investigation into Officer Johnson's conduct on

February 9, 2019, because Pierce County's investigation related to the parties' conduct is still

ongoing, and the City is still waiting to receive the results from Pierce County's Prosecuting

Attorney's Office.  Chief Armitage does not want to interfere with the independence of that

investigation.  Additionally, the City of Roy does not have the resources necessary to conduct a

thorough internal investigation of this type of incident on its own; it needs Pierce County Sheriff's

Department to help, which it can do through a written agreement the City has with Pierce County.

Given that he has not conducted his own investigation or reviewed investigative findings from Pierce

County, Chief Armitage has not yet made a determination as to whether Officer Johnson acted

unlawfully or violated any City of Roy policies on February 9, 2019.  For the same reasons, Chief

Armitage has not disciplined Officer Johnson, who returned to work a few weeks later after being

cleared by a psychologist.

**D.**     **Officer Johnson's Injuries**

On February 10, 2019, Officer Johnson went to the emergency room at Good Samaritan

Hospital complaining of left lower back pain, left knee pain, left rib pain, and neck discomfort.  He

was diagnosed with modified trauma, cervical strain, left knee strain, and lumbosacral strain and

began treating his injuries with physical therapy, occupational therapy, chiropractic treatment, and

massage therapy.  He returned to light duty desk work on February 26, 2019.  He did not return to

full time full duty work for at least another month.  At first, he could not get through the day wearing

his 30-pound bullet-proof vest. His pain made it difficult to fall and stay sleep even over a month

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1  after his injury, and his symptoms worsened with standing or sitting for long periods.

2  **E.     Liability Experts**

3       Plaintiffs have identified five liability experts to testify regarding the forensic evidence,

4  analysis of the video footage of the shooting, and police practices: Matthew Noedel, Criag Luker,

5  Allen Combs, William Harmening, and Neil Low.  See defendants' motions *in limine* for numerous

6  objections to aspects of these experts' planned testimony.  Defendants have four expert witnesses: (1)

7  police practices expert Deputy Chief Kyle Sumpter; (2) accident reconstructionist and visualization

8  expert William Neale; (3) forensic crime scene analyst Richard Tewes; and (4) Dr. Anjali Nandi.

9  Deputy Chief Sumpter will explain why Officer Johnson's actions were consistent with standard

10 police practices, including his decision to shoot.  Mr. Neale will explain how he analyzed the video

11 footage of the shooting and determined that Officer Johnson was likely struck by the vehicle when

12 the ATV approached him on the tracks.  He will also shed light on the information available in the

13 Chevron gas station video.  Mr. Tewes will explain why the physical evidence on Officer Johnson's

14 pants demonstrates that he was likely struck by the brush guard of the ATV and that the physical

15 evidence is consistent with Officer Johnson's testimony about the shooting.  Dr. Nandi will testify

16 about the likely range of Mr. Rice's and Mr. Donahue's Blood Alcohol Content and the impacts that

17 alcohol likely had on their perception and behavior that night.

18 **F.     Damages Experts and Testimony**

19      Plaintiffs have retained Dr. Josef Eichinger to testify regarding plaintiffs' alleged physical

20 injuries as a result of the incident. He will testify that Mr. Donahue will have continued intermittent

21 pain in his hand but no restrictions at work or with daily living and no need for further medical

22 treatment related to his physical injuries. He will also opine that Mr. Rice will have limited pain in

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

his shoulder moving forward. He may attempt to opine that Mr. Rice's shoulder pain may get worse and require surgery, but that opinion if far too speculative to be admissible.  The defense may call Dr. Christopher Boone and/or Dr. John Beck to testify about Mr. Rice's and Mr. Donahue's orthopedic injuries and in rebuttal to testimony offered by Dr. Eichinger.   The parties have stipulated to $195,936.50 in past medical expenses incurred by each of the three plaintiffs, in total.

Psychiatrist Dr. Steven Raffle will testify about plaintiffs' alleged psychological issues as a result of the incident. With respect to Mr. Donahue, he opines that (1) Mr. Donahue suffers from PTSD and Alcohol Use Disorder because of the incident, (2) his failure to mitigate is a result of his personality and is not willful, (3) his recovery prognosis is poor, (4) he will likely not get treatment even though it would likely help him,  (5) he will likely suffer the usual complications of alcoholism in the future, and (6) his emotional distress is stationary.  These opinions fail to take into account that Mr. Donahue's criminal history and history of alcohol and marijuana usage.

As to Mr. Rice, Dr. Raffle opines that (1) the gunshot wound triggered the onset of Mr. Rice' current diagnoses of PTSD, Persistent Depressive Disorder, Spouse or Partner Neglect, and Alcohol Use Disorder, (2) those diagnoses are causing many symptoms, including anxiety, insomnia, isolation, irritability, and flashbacks, (3) his prognosis is poor-to-fair trending to poor, (4) it is likely he will have incompletely successful psychotherapy for his diagnoses disorders, (5) he should undertake psychotherapy once per week for 2-3 years to develop trust in a therapist, and then another 5 years to deal with his diagnosed issues, (6) SSI medications for him would be of assistance, but not curative, (7) he should undergo a 12-step alcohol program, and (8) he should also undergo marital counsel once per week for two years.

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    Plaintiffs plan to call Shelley Lewis as their vocational expert. She does not have a life care

2    plan for Mr. Donahue, because he does not need or will not successfully complete, any future

3    medical treatment.  Her life care plan for Mr. Rice consists of approximately $120,000 for mental

4    health and inpatient alcohol dependency treatment.

5    Defendants will call psychiatrist Paul Ciechanowski, M.D., M.P.H. to address each of the

6    three plaintiffs' mental health care claims.  He will testify that Mr. Donahue does not meet the full

7    criteria for PTSD, and his Alcohol Use Disorder is neither caused nor aggravated by the incident.

8    Mr. Donahue did have depressive symptoms for three months after the incident but those are not

9    active now, and he has some infrequent anxiety symptoms that do not rise to the level of a separate

10    anxiety disorder. He will opine that Mr. Donahue would have a good prognosis if he got into some

11    kind of counseling for a period of 3-6 months and tried some form of medication. He will also

12    testify that Mr. Donahue has Alcohol Use Disorder and Cannabis Use Disorder that pre-date and

13    are not related to this shooting event.

14    Dr. Ciechanowski will testify that Mr. Rice has PTSD related to the February 9, 2019

15    incident, and that his Alcohol Use Disorder was aggravated by the incident but is in partial

16    remission.  He would benefit from initiating counseling, group therapy, and/or a 12-step outpatient

17    program to address his drinking.  He would also benefit from weekly psychotherapy to address his

18    PTSD.  He found that Mrs. Rice has chronic depression and anxiety that has gone largely untreated

19    the last 2-3 years and has been exacerbated by her husband's mental health issues. She would

20    benefit from re-initiating frequent and meaningful psychotherapy with her counselor and

21    adjustment of her medications as suggested by Dr. Raffle. Dr. Ciechanowski will also rebut a

22    number of Dr. Raffle's opinions.

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    Dan Thompson is defendants' life care planning expert. He will likely testify in rebuttal to

2    Ms. Lewis' opinions and offer his own evaluation of Mr. Rice's and Mr. Donahue's future needs

3    for medical treatment and services.  He has been unable to complete his report to date, because he

4    has been waiting to receive opinions for Dr. Ciechanowski, which were not available until August

5    5, and August 8, 2021.  The defense plans to produce Mr. Thompson's opinions within a few days

6    of this filing.

7    ### III.   APPLICABLE LAW

8    **A.    Plaintiffs' Fourth Amendment Excessive Force Claims Against Officer Johnson**

9    The standard for analyzing excessive force claims was established in *Graham v. Connor*,

10   490 U.S. 386, 396, 109 S. Ct. 1865 (1989).  Excessive force claims are evaluated under the Fourth

11   Amendment's reasonableness standard, and the court considers (1) the severity of the crime at issue,

12   (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3)

13   whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Smith v. City of Hemet*,

14   394 F.3d 689, 701 (9th Cir. 2005). The Ninth Circuit also considers the availability of alternative

15   methods of capturing or subduing a suspect.  *Smith*, 394 F.3d at 703.

16   Reasonableness is assessed from the perspective of an objectively reasonable officer on the

17   scene, rather than with the 20/20 vision of hindsight, and must allow for the fact that "police officers

18   are often forced to make split-second judgments – in circumstances that are tense, uncertain, and

19   rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*,

20   490 U.S. at 396. Where an "officer has probable cause to believe that the suspect poses a threat of

21   serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to

22

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 13

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1  prevent escape by using deadly force." *Tenn. v. Garner*, 471, U.S.1, 10, 105 S. Ct. 1694 (1985). The

2  critical inquiry is what the police officer perceived. See *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th

3  Cir. 2010).

4      "[I]t is undisputed that an automobile can inflict deadly force on a person and that it can be

5  used as a deadly weapon." *United States v. Anchrum*, 590 F.3d 795, 801 (9th Cir. 2009) (citing

6  *United States v. Aceves-Rosales*, 832 F.2d 1155, 1157 (9th Cir. 1987)). Furthermore, courts have

7  held that it is constitutional for law enforcement officers to use deadly force when faced with the

8  threat of harm posed by an individual in an automobile. *Wilkinson*, 610 F.3d 546 (no constitutional

9  violation when officer shot driver of minivan that failed to adhere to police commands to stop

10  vehicle, as he accelerated the minivan around a muddy yard within nine seconds of a PIT maneuver);

11  *Whitaker v. Pima County*, 640 F. Supp. 2d 1095, 1104 (D. Ariz. 2009) (no constitutional violation

12  where officers shot driver of a stolen vehicle that was accelerating arounda parking lot near officers);

13  *Waterman v. Batton*, 393 F.3d 471, 478 (4th Cir. 2005) (granting qualified immunity where officers

14  were "faced with a suspect well positioned to seriously injure or kill one or more of them with his

15  vehicle - possibly within a fraction of a second - if they did not employ deadly force."); *Scott v.

16  Edinburg*, 346 F.3d 752, 757-58 (7th Cir. 2003) (officer actedreasonably in shooting driver that had

17  stolen his vehicle, put it in reverse towards off-duty officer,and then accelerated towards others in

18  the parking lot); *Pace v. Capobianco*, 283 F.3d 1275, 1277-78, 1281 (11th Cir. 2002) (officers

19  entitled to qualified immunity when they shot and killed a suspect after the suspect led the police

20  officers on a high speed chase and failed to leave his vehicle or turn off his engine when he was

21  cornered in a cul-de-sac); *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993) (trooper acted

22  reasonably in shooting because he had probable cause to believe risk of serious injury because driver

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 14

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

forced others cars off the road, and attempted to ram another officer); *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992) (officer reasonably shot driver to stop vehicle, which can be deadly weapon, from injuring others near a roadblock).

Additionally, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014). In *Plumhoff*, the Court implicitly rejected that the reasonableness of force used depended upon the number of rounds fired. *Id.* "[I]f lethal force is justified, officers are taught to keep shooting until the threat is over." *Id.*

The overwhelming weight of credible evidence at trial will prove that Mr. Rice hit Officer Johnson with his ATV, picking up Officer Johnson and causing him to form an objectively reasonable belief that he was about to be run over and die. Under such circumstances, his decision to fire his gun four times was objectively reasonable. The manner in which Officer Johnson set up his attempted stop of the plaintiffs on the railroad tracks, or whether he was able to get out of the way in time, are immaterial to this Fourth Amendment analysis. In *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), the Court ruled a plaintiff could not bring a Fourth Amendment excessive force claim based on a lawful use of force under the theory that the officer needlessly created the situation that necessitated the use of force. In so doing, the Supreme Court abrogated the Ninth Circuit's provocation rule, which had permitted excessive force claims under the Fourth Amendment "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation." *Id.* at 1546. If the jury concludes that Officer Johnson was in reasonable fear for his life at the moment he fired his weapon, they will also likely conclude that he did not violate the plaintiffs' Fourth Amendment rights.

**Christie Law Group, PLLC**
2100 Westlake Avenue N., Suite 206
Seattle, WA 98109
206-957-9669

1    **B.      Qualified Immunity for Officer Johnson**

2            The federal qualified immunity inquiry asks two questions: (1) was there a violation of a

3    constitutional right, and, if so, (2) was the right at issue "clearly established" such that it would have

4    been clear to every reasonable officer that hisconduct was unlawful in that situation. *Saucier v. Katz*,

5    533 U.S. 194, 201-02 (2001), *abrogated,in part, by Pearson v. Callahan*, 129 S. Ct. 808 (2009) (it is

6    not always necessary to first determinewhether a constitutional violation occurred); *Ashcroft v. al-*

7    *Kidd*, 131 S. Ct. 2074, 2083 (2011).  A right is clearly established if the contours of the right are

8    sufficiently clear that every reasonable officer would understand that what he is doing violates that

9    right. *Ashcroft*, 131 S. Ct. at 2083. This requires some existing precedent to have placed the statutory

10   or constitutional question beyond debate. *Id*.

11            [C]learly established law should not be defined at a high level of generality. As this
12            Court explained decades ago, the clearly established law must be "particularized" to
             the facts of the case. Otherwise, "[p]laintiffs would be able to convert the rule of
             qualified immunity . . . into a rule of virtually unqualified liability simply by alleging
13            violation of extremely abstract rights."

14   *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal cites omitted).

15            Specificity is especially important in the Fourth Amendment context, where the Court
             has recognized that it is sometimes difficult for an officer to determine howthe relevant
16           legal doctrine, here excessive force, will apply to the factual situation the officer
             confronts. Use of excessive force is an area of the law "in which the result depends
17           very much on the facts of each case," and thus police officers are entitled to qualified
             immunity unless existing precedent "squarely governs" the specific facts at issue.

18   *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018) (internal cites omitted).

19            There is always a risk at trial that the jury determines factually that Mr. Rice likely hit Officer

20   Johnson with the ATV and that Officer Johnson fired his weapon in response to an objectively

21   reasonable fear for his life, but still find for plaintiffs on their Fourth Amendment claim.  The risk of

22

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 16

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   this happening is realistic in a case like this one, where the jury is also asked to analyze a state law

2   negligence claim that encompasses numerous facts and decisions made by both parties during the

3   course of the entire evening.  For example, a jury could find that Officer Johnson was negligent in the

4   manner by which he attempted to stop the plaintiffs in their ATV as they drove down the train tracks,

5   and therefore improperly determine that his use of force was excessive, even though at the time he

6   fired, his fear of imminent death or serious bodily harm was reasonable.  As set forth above, if the

7   jury determines that at the time he fired, Officer Johnson had been struck by the ATV and believed

8   he faced imminent risk of death or serious bodily harm, plaintiffs' Fourth Amendment excessive force

9   claim should be dismissed, even if that fear was mistaken.  Pursuant to *Morales v. Fry*, 873 F.3d 817,

10  824 (9th Cir. 2017), the Court can (and should) submit special interrogatories to the jury to determine

11  key factual issues necessary for the Court to make a qualified immunity determination.  *Morales v.*

12  *Fry*, 873 F.3d 817, 826 N.8 (9th Cir. 2017) (when qualified immunity remains an issue at trial, the

13  "better practice" is to submit special interrogatories to the jury, so there is not "the difficult of inferring

14  how the jury decided disputed factual issues based on a general verdict[, which] has often resulted in

15  multiple rounds of litigation."); *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1086 (9th Cir. 2017)

16  (a district court's decision whether to give special interrogatories is reviewed for an abuse of

17  discretion); *Sloman v. Tadlock*, 21 F.3d 1462, 1469 n.9 (9th Cir. 1994) (district court should use

18  special interrogatories "where the jury's verdict does not necessarily rely on factual findings which

19  are determinative of the immunity issue."); *Reese v. County of Sacramento*, 888 F.3d 1030, 1037-40

20  (9th Cir. 2018) (relying on special interrogatories to affirm post-trial grant of qualified immunity).

21

22

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 17

1  **C.     42 U.S.C. § 1983 Claim Against the City of Roy**

2       A municipality cannot be held liable under 42 U.S.C. § 1983 solely because it employs

3  a tortfeasor. *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018 (1978).

4  Instead, a plaintiff seeking to establish municipal liability must demonstrate that the municipality

5  had a deliberate policy, custom, or practice that was the moving force behind the constitutional

6  violation suffered. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013).   To do so, a

7  plaintiff must establish that the alleged unconstitutional action was either the result of an

8  unconstitutional custom or policy; the result of a deliberate indifference to a known need to train;or

9  ratified by the City's chief policymaker. *Clouthier v. County of Contra Costa*, 591 F.3d 1232,1249

10  (9th Cir. 2010); *Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001). Absent  a

11  constitutional violation, there can be no municipal liability under 42 U.S.C. § 1983. *Quintanilla*

12  *v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996).

13       Here, the Court has already determined that plaintiffs' only actionable theory is one of

14  ratification, under which "an official with final policy-making authority ratified a subordinate's

15  unconstitutional action or decision and the basis for it." *Hopper*, 241 F.3d at 1083. "[R]atification

16  requires, among other things, knowledge of the alleged constitutional violation." *Christie v. Iopa*,

17  176 F.3d 1231, 1239 (9th Cir. 1999).

18       Plaintiffs' sole claim under *Monell* is that Chief Armitage (not the Mayor or any other

19  policymaker) ratified unconstitutional conduct.  See Complaint, dkt. #1 ("Chief Armitage ratified

20  Officer Johnson's actions.")  Plaintiffs base this claim on the allegation that Chief Armitage did not

21  place Officer Johnson on administrative leave after the shooting, that Chief Armitage did not conduct

22  an internal investigation of the shooting to determine if Officer Johnson violated a City of Roy Police

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   policy, and that Chief Armitage did not force Officer Johnston to provide the City with a written

2   statement – apparently in an attempt to cover up wrongdoing by his officer.  While not mentioned

3   anywhere in their Complaint, plaintiffs have argued in litigation that Mayor McDaniel somehow acted

4   wrongfully by issuing a press release drafted by Officer Johnson's attorneys about what had

5   happened.  There is no ratification theory pled based upon Mayor McDaniel's actions (nor are there

6   allegations that he is the chief policy-maker for the Roy Police Department), and issuing a press

7   release under these circumstances could not possibly amount to ratification even if this theory was

8   pled. Here, the evidence at trial will not establish *Monell* liability against the City.

9   **D.**    **State Law Negligence Claim Against Officer Johnson and the City of Roy**

10       In *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 442 P.3d 608 (2019), the Washington

11   Supreme Court provided some clarity about how and when police officers can be held negligent, given

12   the parameters of the public duty doctrine. It held that Washington common law has "long

13   recognized" the potential for tort liability based on the negligent performance of law enforcement

14   activities. *Id.* at 543. It also made clear that plaintiffs can pursue a negligence claim as well as

15   intentional torts arising from the same alleged conduct.  *Id.* at 547-48.  The common law duty, owed

16   by police officers and as expressed in *Beltran-Serrano*, is to refrain from directly causing harm to

17   another through affirmative acts of misfeasance. *Id.* at 550. When officers do act and have a direct

18   interaction with a person, they have a duty to exercise reasonable care. *Id.* at 551. A city's statutory

19   duty to provide police services, enforce the law, and keep the peace are still nonactionable duties

20   owed to the public at large.  *Id.* at 551-52.

21       Plaintiffs' negligence claim can only be based on the manner in which Officer Johnson set

22   up his confrontation with the ATV on the railroad tracks. Defendants' police practices expert,

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 19

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Deputy Chief Kyle Sumpter will testify that Officer Johnson had probable cause to stop Mr. Rice and Mr. Donahue (a legal finding this Court has also already made), and that the shooting was consistent with standard police practices and justified because Officer Johnson was in present danger of great bodily harm.  There is no allegation, nor is there authority to support a claim, that Officer Johnson negligently fired his weapon.  To the contrary, plaintiffs allege he intentionally shot them in an ambush.  This theory cannot support a claim for negligent shooting.  Rather, plaintiffs' negligence claim can only be based on the events leading up to the shooting.

Further, because the public duty doctrine bars it, and because Officer Johnson was acting in the course and scope of his employment at all relevant times, the Court should not instruct the jury on any claim against the City for negligent hiring, retention, training, or supervision of Officer Johnson.  Under the public duty doctrine, "a public entity has a duty of care when it owes a duty of care 'to the injured plaintiff,' but does not have a duty of care when it owes a duty 'to the public in general.'" *Osborn v. Mason County*, 157 Wn.2d 18, 27, 134 P.3d 197 (2006) (citing *Babcock v. Mason County Fire Dist. No. 6.*, 144 Wn.2d 774, 785, 30 P.3d 1261 (2001).  This rule is often paraphrased as "a duty to all is a duty to no one."  *Osborn*, 157 Wn.2d at 27.  There are four exceptions to the public duty doctrine: (1) special relationship; (2) legislative intent; (3) failure to enforce; and (4) volunteer rescue. *Babcock*, 144 Wn.2d at 786.  If an exception applies, the public entity owes a duty to the plaintiff, the breach of which is actionable.  *Donohoe v. State*, 135 Wn. App. 824, 834, 142 P.3d 654 (2006).  There is no evidence to satisfy any of these exceptions.  Further, courts have consistently held that any duty to supervise, train, retain, or supervise officers is one owed to the general public, not to any particular individual.

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

[T]he public duty doctrine means that the City cannot be liable merely for allegedly breaching its general responsibilities to supervise law enforcement officers or investigate citizen complaints. *See Osborn,* 134 P.3d at 203 ("[A] broad general responsibility to the public at large rather than to individual members of the public simply does not create a duty of care.") (quoting *Campbell v. City of Bellevue,* 85 Wn.2d 1, 530 P.2d 234, 238–39 (1975)); *see also Shope v. City of Lynnwood,* No. C10–0256RSL, 2011 WL 1154447, at *6 (W.D. Wash. Mar. 28, 2011) ("The duty of the City to hire, train, retain, and supervise its officers is owed to the public at large, not to plaintiff individually."); *Dowell v. City of Lynnwood,* No. C06–1240–JCC, 2007 WL 4365793, at *6 (W.D. Wash. Dec.11, 2007) (holding that the public duty doctrine foreclosed a claim against the City for negligent hiring, training, supervision, and retention of two police officers).

*Fuller v. Lee*, C13-0563JLR, 2014 WL 6982519, at *13 (W.D. Wash. Dec. 9, 2014).

Additionally, because Officer Johnson was acting in the course and scope of his employment, any claim for negligent hiring, training, retention, or supervision that survives public duty doctrine analysis collapses into a claim for vicarious liability for Officer Johnson's conduct. An employer is vicariously liable for the negligence of its employees conducted within the scope or course of employment. *Niece v. Elmview Group Home*, 131 Wn.2d 39, 48, 929 P.2d 420 (1997). In order to establish a negligent supervision claim, plaintiff must show that (1) an employee ***acted outside the scope of his or her employment***; (2) the employee presented a risk of harm to other employees; (3) the employer knew, or should have known in the exercise of reasonable care that the employee posed a risk to others; and (4) that the employer's failure to supervise was the proximate cause of injuries to other employees. *Niece*, 131 Wn.2d at 48-51(emphasis added); *Briggs v. Nova Servs.*, 135 Wn. App. 955, 966-67, 147 P.3d 616 (2006). When an employer does not disclaim liability for the acts of its employees, a negligent supervision claim collapses into the direct tort claim against the employer. *Gilliam v. Dep't of Social & Health Servs.*, 89 Wn. App. 569, 584-85, 950 P.2d 20 (1998). Negligent supervision imposes a duty for the employer to control

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   an employee acting outside the scope of the employee's employment.  *Niece*, 131 Wn.2d at 51.

2   However, the employer must know or have constructive knowledge "that the employee presented

3   a risk of danger to others." *Id.* at 48–49.  Even assuming Officer Johnson was somehow acting

4   outside the course and scope of his employment, there will be no evidence that Officer Johnson

5   posed a risk of danger to others, much less that the City knew of and disregarded such a disposition.

6      Similarly, in order to establish a claim for negligent retention, plaintiff must prove that (1)

7   the defendant knew or should have known of the employee's unfitness, and (2) that the negligently

8   hired employee caused the plaintiff's injuries.  *Betty Y. v. Al-Hellou,* 98 Wn. App. 146, 149, 988

9   P.2d 1031 (1999), *rev. denied* 140 Wn.2d 1022, 10 P.3d 403 (2000).  The focus should be on the

10  process taken by the employer, rather than on whether specific questions were asked.  *Brown v.*

11  *Labor Ready Northwest Inc.,* 113 Wn. App. 643, 54 P.3d 166 (2002), *rev. denied* 149 Wn.2d 1011,

12  69 P.3d 875 (2003).  An employer's duty is limited to preventing "the tasks, premises, or

13  instrumentalities entrusted to an employee from endangering foreseeable victims." *Betty Y. v. Al-*

14  *Hellou,* supra at 149, (quoting *Niece,* 131 Wn.2d at 48).  There is no evidence to support any claim

15  for negligent supervision, hiring, training, or retention.  The Court should not instruct the jury on

16  that negligence theory, nor should it allow any evidence or argument that the City did not properly

17  hire, retain, train, or supervise Officer Johnson.  That evidence is either irrelevant or has such

18  minimal probative value that it is benefit at trial is far outweighed by the unfair prejudice it poses.

19  **E.   RCW 5.40.060 Intoxication Defense**

20     It is a complete defense to a state law action for damages that the injured plaintiff was

21  under the influence of intoxicating liquor or any drug at the time of the occurrence causing the

22  injury and that such condition was a proximate cause of the injury, so long as the intoxicated person

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 22

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

was more than 50% at fault. RCW 5.40.060. To determine whether a person was under the influence of intoxicating liquor or drugs, the court looks to RCW 46.60.502, which states that a person is under the influence if (1) the person has an alcohol concentration of 0.08 within 2 hours of the event; or (2) the person is affected by intoxicating liquor, marijuana, and/or any drug. Defendants' expert, Dr. Anjali Nandi, will testify that both Mr. Donahue and Mr. Rice were under the influence of alcohol at the time of the incident and about the impacts of alcohol intoxication. Law enforcement witnesses and first responders will also testify to their observations that Mr. Rice and Mr. Donahue were visibly intoxicated.  Finally, both plaintiffs admit to consuming large quantities of alcohol in the hours leading up to the incident.  The Court should instruct the jury on this defense.

**F.     RCW 4.24.420 Commission of a Felony Defense to State Law Claims**

RCW 4.24.420 provides that it is a complete defense to a negligence claim action if the jury finds beyond a reasonable doubt that the plaintiffs were engaged in the commission of a felony at the time of the occurrence causing their injuries and that the felony was a proximate cause of their injuries.  Mr. Rice was engaged in felony eluding, felony assault, and felony vehicular assault at the time Officer Johnson shot him.  Mr. Donahue was an accomplice, and therefore also engaged in felonious conduct, when he was shot.  See RCW 46.61.024; RCW 46.61.522; RCW 9A.08.020. The Court should instruct the jury on this defense.

**G.     Contributory Fault**

Under Washington's contributory fault statute, in any action for personal injuries based on fault, any contributory fault chargeable to the plaintiff diminishes proportionately the amount awarded as compensatory damages, but it will not bar recovery. RCW 4.22.005.

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   Mr. Donahue conceded that they were driving recklessly through the City before they drove

2   back home on the train tracks; Mr. Rice was not able to get both wheels into the tracks when he

3   turned onto them, creating a more hazardous driving condition; the windows and windshields were

4   foggy, making it more difficult to see as they moved down the tracks at a high rate of speed; Mr.

5   Rice was not even able to sit upright because of the angle of the ATV; and there was more than

6   enough space to bring the ATV to a stop if they had wanted to, but he did not want to because he

7   did not believe there was any reason for them to do so, despite seeing the bright light facing

8   towards them.  Mr. Rice also testified that he could see the outline of a car and a person as he sped

9   down the tracks toward the bright light, but he felt no need to come to stop to make sure he did not

10  hit anyone. These facts, coupled with all the poor decisions Mr. Rice and Mr. Donahue made

11  earlier that evening, will established the plaintiffs' contributory fault at trial.

12  **H.     Loss of Consortium Claim**

13  Loss of consortium relates to the loss of love, affection, care, services, companionship,

14  society, and consortium. *Christie v. Maxwell*, 40 Wn. App. 40, 44, 696 P.2d 1256 (1985). Washington

15  characterizes loss of consortium claims as separate and independent rather than derivative of the

16  injured spouse's claim. *Oltman v. Holland America Line USA, Inc.*, 163 Wn.2d 236, 250, 178 P.3d

17  981 (2008). Under state law, a loss of consortium claim is not barred simply because no claim can be

18  brought based on the injury of the injured spouse. *Id*. However, loss of consortium damages are

19  reduced by the spouse's contributory fault under RCW 4.22.020. Additionally, there is no companion

20  loss of consortium claim in federal court for this type of injury.  Mrs. Rice's claim for loss of

21  consortium is contingent on her husband prevailing on his negligence claim.

22  / / /

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 24

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1

### IV.   CONCLUSION

2      The evidence at trial will support a conclusion that Officer Johnson did not use excessive force

3  on the date of the incident, nor was he negligent.  The evidence will also show that Mr. Rice and Mr.

4  Donahue are contributorily at fault for their own damages, were intoxicated at the time of the incident,

5  and were engaged in felonious conduct at the time of the incident. Defendants look forward to trial.

6      Respectfully submitted this 12th day of August, 2021.

7                    CHRISTIE LAW GROUP, PLLC

8                        By _____/s/ Ann E. Trivett_____
                           ANN E. TRIVETT, WSBA #39228
9                          Attorney for Defendants City of Roy,
                              Chris Johnson, and Darwin Armitage
10                         2100 Westlake Avenue North, Suite 206
                           Seattle, WA  98109
11                         Telephone:  (206) 957-9669
                           Email: ann@christielawgroup.com

12

13

14

15

16

17

18

19

20

21

22

DEFENDANTS' TRIAL BRIEF
(3:20-cv-05223-RJB) - 25